IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SARAMARIE LATONA BURCLAW,

                        Plaintiff,                        OPINION AND ORDER

    v.

                                                      18-cv-855-wmc

STANDARD INSURANCE COMPANY,

                        Defendant.

At bottom, this lawsuit concerns plaintiff Saramarie Latona Burclaw's claim that defendant Standard Insurance Company ("Standard") wrongfully denied her an additional life insurance benefit of $100,000 following the death of her husband, but largely turns on whether the insurance policy at issue is exclusively governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiff initially brought claims for common law breach of contract and bad faith in Wisconsin state court. Defendant subsequently removed the lawsuit to federal court, asserting ERISA preemption as an affirmative defense. Plaintiff responded by filing a combined motion for declaratory relief establishing her right to proceed on her state law claims or, alternatively, to amend her complaint to seek relief under ERISA. (Dkt. #7.) Defendant then filed a motion for summary judgment. (Dkt. #12.) For the reasons discussed below, the court will deny plaintiff's motion for declaratory relief, grant in part and deny in part defendant's motion for summary judgment, and grant in part and deny in part plaintiff's motion to amend her complaint.

Plaintiff Saramarie Latona Burclaw is the widow of David Burclaw, who had been an employee of West Bend Mutual Insurance. West Bend contracted with defendant Standard to provide certain insurance benefits for its employees. On February 21, 2013, Mr. Burclaw enrolled in Standard's group life insurance policy through West Bend's employee plan, including both Basic Term Life, paid with premiums by West Bend, and Additional Term Life, with premiums paid by Burclaw.

Due to health issues, Mr. Burclaw became disabled in April of 2015, and Standard sent a letter on October 19, 2015, advising that he had been approved for a waiver of life insurance premium payments due to his disability. The letter also included the following statement regarding Mr. Burclaw's benefits:

> How much Life Insurance do I have?
> The following amount of Group Life Insurance was in force on
> the date you became Disabled:
> $204,000.00 Basic Term Life Insurance
> $250,000.00 Additional Term Life Insurance
> $10,000.00 Dependent Child Life Insurance

(Blocher Decl., Ex. B (dkt. #11-2) 1.) Standard sent a similar letter to West Bend, in which it also stated that Mr. Burclaw's additional life insurance coverage amount was $250,000. (Blocher Decl., Ex. A (dkt. #11-1) 1.)

On April 9, 2017, Mr. Burclaw passed away, and plaintiff subsequently contacted West Bend to claim the life insurance benefits as his widow. West Bend in turn submitted

---

[1] The following facts are taken from the parties' proposed findings of fact, responses to those findings, and underlying documents, where appropriate. For the purposes of summary judgment, the facts are found to be material and undisputed unless otherwise indicated.

a claim form to Standard, indicating that Mr. Burclaw had $204,000 in basic life benefits, but only $150,000 in additional life benefits. On May 1, 2017, Chandra Topp, Senior HR Generalist at West Bend, contacted Standard asking: "Any further information on the coverage amount? I would like to get back to Dave's wife today. I believe it should be $204 basic life and $150K VLI [voluntary life insurance]. Please confirm." (Jones Decl., Ex. A (dkt. #22-1) 132.) A representative from Standard responded that, according to the ReportsOnline system, Mr. Burclaw was approved for $250,000 in additional life insurance. Topp responded, asking "Are you sure about the 250K? I looked back and I only ever see $150K for him in VLI." (*Id.*)

On June 12, 2017, Standard paid out the undisputed portions of the benefits to Ms. Burclaw: the $204,000 in basic life and $150,000 in additional life insurance benefits. On June 13, 2017, Topp emailed to Standard copies of Mr. Burclaw's payroll records for the September 6, 2014, through October 17, 2015, pay periods. In her email, Topp wrote: "Attached are the pay statements for Dave Burclaw which align with the $150k for VLI." (*Id.* at 80.)

On July 21, 2017, Standard notified Ms. Burclaw that it had completed its review of Mr. Burclaw's life insurance benefits and that:

> Based on our review, we have determined that Mr. Burclaw was enrolled for $204,000, of Basic Life and $150,000, of Additional Life Insurance benefits. . . .
>
> Our review has determined that on February 21, 2013, Mr. Burclaw enrolled for $250,000 worth of Additional Life Insurance with an effective date of March 20, 2013. However, on February 22, 2013, Mr. Burclaw voluntarily reduced the amount of his Additional Life Insurance to $150,000, also to become effective on March 20, 2013. The $250,000 of

> Additional Life Insurance never became effective and Mr. Burclaw was charged [a] premium based on $150,000, worth of Additional Life Insurance coverage. . . .
>
> Our Waiver of Premium approval letter dated October 19, 2015, indicating the higher amount was an inadvertent error. We sincerely apologize for the benefit misstatement.

(*Id.* at 75.)

After Standard notified Ms. Burclaw of its decision to pay out $150,000, as opposed to $250,000, in additional life insurance coverage, she retained counsel and requested that Standard reconsider its decision. When it did not, she then filed suit in state court, alleging breach of contract and bad faith under Wisconsin common law. After removing the case to this court, Standard asserted that plaintiff's state law claims are preempted by federal law because the plan at issue is governed by ERISA.[2] Plaintiff then filed a motion asking the court to determine whether ERISA preempts her state law claims and, if so, declare that *de novo* review of Standard's coverage decision is appropriate under the plan. Plaintiff also seeks leave to amend her complaint to add state law claims for equitable relief -- namely, estoppel and reformation -- and also to include claims under ERISA, should it apply. In its own motion for summary judgment, defendant maintains that (1) ERISA preempts plaintiff's state law claims, (2) the appropriate level of review is an "arbitrary and capricious" standard, and (3) plaintiff's request to amend her complaint would be futile and, therefore, should be denied.

---

[2] This court has jurisdiction over this case under 29 U.S.C. § 1441(a) as the parties are diverse and the amount in controversy exceeds $75,000. (*See* Notice of Removal (dkt. #1) 2.) Moreover, as discussed below, plaintiff will be permitted to amend her complaint to add ERISA causes of action, over which this court also has federal question jurisdiction under 29 U.S.C. § 1331.

OPINION

Although plaintiff styled her filing as a "motion for declaratory relief," that motion is more properly construed as one for summary judgment. *See Boehm v. Scheels All Sports, Inc.*, 202 F. Supp. 3d 1030, 1033 (W.D. Wis. 2016) (construing a motion for declaratory judgment as one for summary judgment); *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) ("[A] party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment . . . . The only way plaintiffs' motion can be construed as being consistent with the Federal Rules is to construe it as a motion for summary judgment on an action for a declaratory judgment.") (quoting *Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995)). Indeed, plaintiff herself requested that the court consider at least part of her motion as seeking partial summary judgment. (*See* Pl.'s Br. (dkt. #9) 10-11 ("In conjunction with the request to declare that ERISA does not preempt Wisconsin law in this case, Ms. Burclaw requests partial summary judgment as to the Standard's affirmative defense pursuant to Federal Rule 56.").) The court will, therefore, treat plaintiff's filing as a cross-motion for partial summary judgment.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I. ERISA Preemption

As noted at the outset, the threshold and potentially dispositive question in this case is whether plaintiff's claims are exclusively governed by federal law, which requires the court to determine whether Mr. Burclaw's additional life insurance plan was governed by ERISA. Plaintiff argues that they are not because: "(1) at the time that Mr. Burclaw obtained the insurance, it was not a part of West Bend's employee benefit plan; and (2) even if it was part of the plan, it [] falls within the 'safe harbor' provision where preemption does not apply." (Pl.'s Br. (dkt. #9) 11.) Defendant contests both arguments, and maintains that plaintiff's claims are, therefore, preempted. Defendant bears the burden as to this issue. *Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) ("Federal preemption is an affirmative defense upon which the defendants bear the burden of proof."); *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988) ("Because Connecticut General's claim of ERISA preemption is a federal defense in this lawsuit . . . the burden is on the defendant to prove the facts necessary to establish it.").

Where, as here, both parties have moved for summary judgment on the same claim, the court must adopt a "'Janus-like' perspective, examining each party's motion in turn and construing all inferences in favor of the party against whom the motion under consideration is made." *Hopkins v. Prudential Ins. Co. of Am.*, 432 F. Supp. 2d 745, 758 (N.D. Ill. 2006). The court will take up defendant's motion first, viewing all facts and drawing all inferences in the light most favorable to plaintiff. *See Anderson*, 477 U.S. at 255. Plus, because the burden of proof rests with defendant, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-

sided as to rule out the prospect of a finding in favor of the non-movant on the claim."
*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). Before addressing whether defendant has met this burden, however, a more detailed discussion of the record with regard to the applicable policy documents and the employee plan's administration is required.

## A. Policy Documents

ERISA requires covered plans to be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a), and also to be reduced to a "summary plan description," § 1021(a). These summaries are often simply referred to as "SPDs." *See, e.g.*, *Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574 (7th Cir. 2000). Here, the parties dispute what, if any, of the documents produced by Standard reflect the written policy document and summary plan description ("SPD") in force during the relevant time.

Essentially at issue are three, written documents produced by defendant: a "Certificate and Summary Plan Description" (Blocher Decl., Ex. M (dkt. #11-13) ("**SPD-M**")); another "Certificate and Summary Plan Description" (Blocher Decl., Ex. O (dkt. #11-15) ("**SPD-O**")); and a "Group Life Insurance Policy" (Blocher Decl., Ex. P (dkt. #11-16) ("**GLIP**")). Plaintiff argues that the first of the plan descriptions, SPD-M, "is the only SPD or plan document produced by the Standard that was in force during the relevant time period [when Mr. Burclaw was enrolled between 2013-2017]." (Pl.'s Opp'n (dkt. #23) 3.) In particular, plaintiff points out that the second plan description, SPD-O contains a footer that says, "Revised 05/30/2018" and that the first page of the GLIP states

"Effective September 1, 2018." (*See* Blocher Decl., Ex. O (dkt. #11-15) 1.) Moreover, plaintiff notes that SPD-M -- again, the only policy document produced in effect during the relevant time period according to plaintiff -- fails to even mention the additional life insurance benefit at issue here.

Defendant argues that plaintiff's reading of these same documents is flawed, arguing that SPD-O and GLIP reflect the terms of both the basic and additional life insurance benefits plans that were in effect during the relevant period. First, defendant objects to plaintiff's reliance on SPD-M, explaining that Mr. Burclaw was covered by another plan and it actually produced this plan in error. Specifically, defendant points to a footer in SPD-M stating that it applies to "Retired Members who retired after 1/1/1999 and prior to 1/1/14." (Blocher Decl., Ex. M (dkt. #11-13) 1.) In contrast, defendant notes, SPD-O, the applicable plan, states "Active Members." (Blocher Decl., Ex. O (dkt. #11-15) 1.) Because Mr. Burclaw was never retired, defendant argues persuasively, SPD-M is by its terms not applicable. Second, defendant explains that the group life insurance policy or GLIP has an effective date of April 1, 2012, and that the September 1, 2018, date repeatedly cited by plaintiff is nothing more than the date of an *amendment* to the GLIP. (Blocher Decl., Ex. P (dkt. #11-16) 1.) Moreover, defendant correctly points out that the footer to the *body* of the group plan (not including the amendments) states: "Printed 05/02/2012." (*Id.* at 25-60.) Third, and finally, while defendant acknowledges that the footer in SPD-O suggests that it was revised *after* Mr. Burclaw enrolled in the Plan, defendant also asserts that the document

> unambiguously sets forth an effective date of April 1, 2012, and indicates that if its terms differ from the Group Policy,

"the terms stated in the Group Policy will govern." [Docket No. 18-15, p. 3 of 39]. The SPD was "Revised 05/30/2018" to reflect Group Policy Amendment No. 11 effective September 1, 2018. *Compare* STND 0003 (Amendment No. 11: "Effective September 1, 2018...") *with* Docket No. 8-15 at p. 11 of 39 ("On September 1 coinciding with or next following the date..."). Reviewing the SPD in conjunction with the Group Policy and its amendments confirm that the additional contributory insurance became available to eligible employees effective April 1, 2012, and that such coverage has not since been modified by the governing document (the Group Policy) in any material manner as it relates to the issues in this case.

(Def.'s Reply (dkt. #30) 4.)

Even viewing the facts and documents of record in the light most favorable to plaintiff, the court agrees with defendant that no reasonable factfinder could conclude that the plan summarized at SPD-M is relevant, as it expressly applies by its terms to retired, as opposed to active, members. Additionally, a reasonable factfinder would necessarily conclude on this record that the GLIP *was* in force during the times relevant to this lawsuit. In particular, the 2018 date principally replied upon by plaintiff is plainly taken out of context from an amendment to that plan, which states in relevant part that: "Effective September 1, 2018 . . . the Group Policy is amended as follows . . . ." (Blocher Decl., Ex. P (dkt. #11-16) 1.) Even more persuasive, after listing the amendments that had been made to the plan, the body of the group policy states that its "Effective Date" is April 1, 2012, and the footer included on every page of the policy reflects that it was "Printed 05/02/2012." (*Id.* at 25-60.)

However, whether SPD-O reflects, as defendant claims, the summary plan

description effective at the relevant times to this lawsuit is a closer question.[3]  As plaintiff

points out, SPD-O has a revision date of May 30, 2018 -- a date that is also printed on the

bottom of every page of that document.  (Blocher Decl., Ex. O (dkt. #11-15) 1-39.)  This

date is *well* past Mr. Burclaw's participation in the plan from 2013 to 2017.   While

defendant suggests that the May 30, 2018, date is unimportant because the amendments

to the underlying group policy (the GLIP document) itself show no material change

between 2012 and 2018, this ignores the possibility of a conflict between the effective

summary plan description and the underlying insurance policy.[4]  A reasonable factfinder

could, therefore, conclude that SPD-O does not adequately reflect the plan actually in force

during the relevant time period.  However, for the reasons explained below with respect to

West Bend's involvement in the plan's administration, including the group insurance

policy at issue, this failing is not necessarily fatal to defendant's preemption argument.

---

[3] The failure of defendant to produce (or, worse, even maintain) the definitive documents is especially frustrating, since it has the burden of proof on this issue.  As discussed below, the limited documentation in this record does not fall entirely on defendant, since plaintiff apparently failed to seek affirmative discovery from the defendant or third-party West Bend, who would also be expected -- both as the policyholder with at least some administrative responsibilities and as a mutual insurance company itself -- to maintain its own records of the applicable plan and policy documents.

[4] That SPD-O contains a disclaimer providing that the terms of the group policy governs in the case of a conflict is unpersuasive as such disclaimers have been found by various courts to be unenforceable.  *See, e.g.*, *Hopkins v. Prudential Ins. Co. of Am.*, 432 F. Supp. 2d 745, 763 (N.D. Ill. 2006) (disclaimer in SPD providing that "[i]n the event this summary differs in any way from the Plans, the actual terms of those documents will govern" was unenforceable); *McKnight v. S. Life & Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir. 1985) ("It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan."); *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 26-27 (4th Cir. 1992) (similar SPD disclaimers are unenforceable); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981-82 (5th Cir. 1991) (same); *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988) (same).

## B. Plan Administration

### 1. Establishment of and Amendments to the Plan

West Bend first selected Standard to provide group life insurance and long-term disability insurance to its employees in 2009. There is no dispute that West Bend submitted to Standard an application for group insurance, and that Standard thereafter issued a group insurance policy to West Bend providing covered employees with Basic Life and Accidental Death & Dismemberment insurance at that time. Then, in 2012, an additional life insurance benefit was added to this group policy. Plaintiff attempts to suggest that *Standard* requested this change (Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #29) ¶ 10), but even viewing the facts in the light most favorable to the plaintiff, the underlying documents show that *West Bend* at least formally initiated the amendment. Indeed, a form titled "Request for Group Insurance Amendment" listed West Bend as the "Employer Name" and provides:

> As an authorized representative of the Employer, I request that Standard Insurance Company ("The Standard") amend the above Employer's coverage under the Group Policy to make the following change(s):
> . . .
> Add to the current Life/AD&D contract Additional Life/AD&D . . . available to all active employees with Basic Life and working at least 40 [hours] each week. Please see the attached proposal 1088117 for the schedule of benefits and associated rates.
> . . .
> I request that the amendment become effective on 4/1/12.

(Yoder Decl., Ex. A (dkt. #21-2) 16.)

Similar records show that West Bend subsequently submitted a number of other "Request[s] for Group Insurance Amendment" forms. (*See id.* at 1-13.) However

formalistic these documents may be, they establish that West Bend was actively involved with ongoing policy changes.

Finally, the group life insurance policy contains the following allocation of authority provision:

> Except for those functions which the Group Policy specifically reserves to the Policyholder [West Bend], we [Standard] have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.
> Our authority includes, but is not limited to:
> 1. The right to resolve all matters when a review has been requested;
> 2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it.
> 3. The right to determine:
>     a. Eligibility for insurance;
>     b. Entitlement to benefits;
>     c. Amount of benefits payable;
>     d. Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.
> Subject to the review procedures of the Group Policy any decision we make in the exercise of our authority is conclusive and binding.

(Blocher Decl., Ex. P (dkt. #11-16) 54-55.)[5]  The functions specifically reserved to West Bend, the policyholder, include:  the determination of "the amount, if any, of each Member's contribution toward the cost of insurance under the Group Policy"; the ability to terminate the Group Policy on written notice; the issuance of certificates to each insured member; and the provision of certain records and reports to Standard.  (*Id.* at 58-60.)

---

[5] The introduction of the GLIP clarified that "'[w]e', 'us', and 'our' mean Standard Insurance Company" and that "'[y]ou' and 'your' mean the Member."  (*Id.* at 21.)  Also, as reflected in the bracket in the block text above, the "Policyholder" is identified as "West Bend Mutual Insurance." (*Id.* at 25.)

## 2. Premium Payments

It is also undisputed that the additional life insurance benefit at issue here was voluntary and required employee contributions -- meaning that Mr. Burclaw paid the premiums associated with this additional benefit. It is similarly undisputed that West Bend paid for and provided to Mr. Burclaw other benefits, including paying the premiums for employees' basic term life benefit. Further, defendant offers proof that West Bend received and maintained monthly invoices for premiums associated with the group policy, including the additional life insurance benefits.

Specifically, defendant points to a letter dated May 15, 2012, in which Standard communicated to West Bend a change in premium rates for various "Product[s] & Services," including "Additional Life." (*Id.* at 27.) Defendant also produced an (undated) "underwriting document" stating in relevant part as follows:

```
*** COMMON PLAN and CLASS RATES ***

Prod Billing Frequency      Sold Rate Rate Description                        ERR  Tot Lives
---- ------------------     --------- ----------------------------------      ---  ----------
BL   12 R - Self              .150 PTHS - Per $1000 of Benefit                No      1,067
     Admin/Summary
     Billing

AA   12 R - Self              .015 PTHS - Per $1000 of Benefit                No        239
     Admin/Summary
     Billing

AL   12 R - Self              .151 PTHS - Per $1000 of Benefit                No        208
     Admin/Summary
     Billing
```

(*Id.* at 23.) Defendant argues this document in particular shows that West Bend was invoiced once a month for premiums associated with additional life insurance ("AL") under a "Self-Admin/Summary Billing method." (Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #29) ¶ 5.) A separate document describes this same billing method as follows: "The Standard provides a generic monthly statement showing total insured volume and total

number of lives. The group [here, West Bend] is responsible for tracking eligibility and changes." (Yoder Decl., Ex. A (dkt. #21-1) 22.)

Although she admits that the Self-Admin/Summary Billing method applied to the 2009 non-contributory plan, plaintiff complains that because the actual invoices were not provided, "it is unclear whether that was actually carried out." (Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #29) ¶ 4.) She also pushes back against Standard's contention that the contributory additional life insurance plan was governed by the Self-Admin/Summary Billing method. (*Id.* ¶¶ 5-7.) The court agrees that there is some room for a factual dispute as to the invoice and billing method for the additional life insurance plan; while Standard's interpretation of the limited documents it produced is reasonable, the failure to offer definitive documentation means inferences are required (such as interpreting "AL" as "additional life" and concluding that the undated underwriting document was applicable during the relevant time), which a reasonable factfinder could question.

### 3. Form 5500 Filings by West Bend

As an employee benefit plan sponsor, West Bend also submitted regular Form 5500 filings to the IRS.[6] (Wagener Decl., Ex. A (dkt. #19-1) 1-40.) The documents produced by Standard indicate that West Bend filed these forms every year from at least 2012 through 2017. (*Id.*) Plaintiff does not dispute that West Bend filed these forms, but "den[ies] that the 5500 form explicitly says anything about the voluntary, contributory

---

[6] "Form 5500 is an annual report disclosing financial and actuarial information that is required to be filed with the Secretary of Labor under ERISA." *Bolssen v. Unum Life Ins. Co. of Am.*, 629 F. Supp. 2d 878, 882 (E.D. Wis. 2009) (citing 29 U.S.C. §§ 1023, 1024).

[additional life insurance] plan."  (Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #29) ¶ 23.)  However, each of the forms list "148233" as the "contract number" (Wagener Decl., Ex. A (dkt. #19-1) 1-40), which matches with the "Policy Number" listed on the Group Life Insurance Policy document -- a document that *includes* the additional life insurance benefit at issue in this case.  (Blocher Decl., Ex. P (dkt. #11-16) 21.)  So, while plaintiff is again technically correct that the forms do not *explicitly* reference an additional life insurance "plan," they plainly reference the overall group policy that includes the additional life benefit.  Accordingly, a reasonable factfinder could not conclude that the filings excluded the so-called additional life insurance "plan"; rather, it was part of the same group insurance plan.

### C. Analysis

As discussed above, the evidence at summary judgment shows that the group life insurance policy or GLIP was the only underlying insurance policy in force during the relevant time period, but there is a factual dispute as to whether Standard has produced a contemporaneous SPD.  Given this dispute, plaintiff suggests that defendant has failed to meet its burden to prove that the additional life insurance benefit at issue is governed by ERISA.  (Pl.'s Br. (dkt. #9) 12; Pl.'s Opp'n (dkt. #23) 3.)  However, while ERISA requires covered plans to be reduced to an SPD, *see* 29 U.S.C. § 1022, an SPD is not required to prove the *existence* of an ERISA plan.  *See Bolssen v. Unum Life Ins. Co. of Am.*, 629 F. Supp. 2d 878, 882-83 (E.D. Wis. 2009) ("[C]ourts have consistently rejected the argument that the failure to comply with formal requirements can prevent the establishment of an ERISA plan.").  Rather, a welfare plan is governed by ERISA if it is:

> (1) a plan, fund, or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits, (5) to participants or their beneficiaries.

*Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 537 (7th Cir. 2000) (quoting *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986)).

Further, the Department of Labor has set forth a "safe harbor" provision to clarify whether an insurance plan falls under ERISA. *See id.* According to the regulation, a plan is not governed by ERISA where:

> (1) No contributions are made by an employer or employee organization;
> (2) Participation in the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j).

Plaintiff argues that the additional life insurance benefit (or "plan" as plaintiff insists on calling it) falls under the Safe Harbor Provision. (Pl.'s Br. (dkt. #9) 13-15.) At the outset, she contends that the additional life insurance benefit should be considered a separate "contributory plan," wholly apart from the non-contributory aspects of the overall

16

benefits package, including the basic term life insurance benefit.  This is significant as not even plaintiff appears to dispute that the non-contributory aspects of the group policy are governed by ERISA.[7]

Plaintiff cites two cases -- *Smith v. Standard Ins. Co.*, 2018 WL 703133 (W.D. Okla. Feb. 2, 2018) and *Gardner v. E.I. Dupont De Nemours & Co.*, 939 F. Supp. 471, 476 (S.D.W. Va. 1996) -- in which, she argues, courts evaluated contributory and non-contributory plans separately for purposes of determining ERISA preemption.  (*Id.* at 15.)  However, neither effectively advances plaintiff's position.  In *Smith*, plaintiff contends that the court applied state law to the contributory portion of an employer-issued life insurance policy. (Pl.'s Br. (dkt. #9) 15.)  The actual holding in *Smith* was that ERISA governed *both* the non-contributory and contributory portions of the plan, and state law applied only with regard to plaintiff's separate, incontestability clause claim -- a claim expressly saved from ERISA preemption by 29 U.S.C. § 1144(b)(2)(A).  *Smith*, 2018 WL 703313, at *2-4. Moreover, in *Gardner*, the court merely held that in the context of a *motion to dismiss*, "[t]he facts so far developed do not establish conclusively . . . that ERISA wholly pre-empts Plaintiff's state law claims in regard to the contributory policy."  939 F. Supp. at 473.

In contrast, the Seventh Circuit held that a supplemental life insurance policy for

<hr />

[7] Indeed, although not binding or essential to the court's holding, plaintiff appears at various points in her brief to implicitly concede this point.  (*See* Pl.'s Br. (dkt. #9) 12 ("First and foremost, at the time that Mr. Burclaw enrolled in and paid for his voluntary life insurance coverage with the Standard, it was not a part of his employer's ERISA plan."); Pl.'s Opp'n (dkt. #23) 8 ("Moreover, no documents in the file establish that West Bend ever considered the voluntary, contributory plan a portion of its ERISA benefit, rather than simply an opportunity for its employees to purchase additional life insurance on a group basis. Nothing in the Standard's underwriting file suggests that West Bend included 'Plan 2' within its ERISA plan.").)

which the employee paid all premiums should not -- for the purposes of determining whether ERISA governed any claims -- be considered separately from the basic life insurance policy and other benefits in the employer's overall group insurance plan. *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 930 (7th Cir. 2018). Similarly, in *Postma*, the Seventh Circuit advised that "[f]or purposes of determining whether a benefit plan is subject to ERISA, its various aspects ought not be unbundled." 223 F.3d at 538. In line with these holdings, therefore, the court concludes that the various aspects of West Bend's employee benefits plan and group life insurance policy, including the additional term life insurance benefit, should be considered together.

Viewed in this light, the plan and group policy are governed by ERISA. As an initial matter, the plan falls out of the safe harbor provision as West Bend paid the premiums for some of the benefits, and the safe harbor requires that "*[n]o* contributions" be made by the employer or employee organization. 29 C.F.R. § 2510.3–1(j) (emphasis added). Further, the undisputed facts show that the plan easily meets four out of the five elements of an ERISA benefit plan: West Bend is undoubtedly an "employer," and the purpose of the group life policy -- the "plan" -- was to provide death benefits to the participants and their beneficiaries.

The remaining element -- whether the plan was "established or maintained" by West Bend -- involves some greater discussion. The record shows that West Bend submitted an application to Standard to create the initial plan in 2009; and in 2012, the additional term life insurance benefit at issue here was expressly added to this overall group life insurance plan by formal amendment at West Bend's request. That West Bend initially established

the plan strongly suggests ERISA coverage, as the test suggests only that the plan be established *or* maintained. *See Russo v. B & B Catering, Inc.*, 209 F. Supp. 2d 857, 861 (N.D. Ill. 2002) (noting that, where employer initially contracted with insurance company to "establish" the plan, "[e]ven if the plan is no longer maintained by the employer, it was still established by the employer" and that the "test's disjunctive language -- established *or* maintained -- suggests that ERISA still applies").  Further, although West Bend contracted with Standard to provide this group policy, rather than providing the plan directly itself, similar schemes have previously been found to be covered by ERISA.  *See, e.g.*, *Brundage-Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 511 (7th Cir. 1989) (ERISA plan may be found where an employer contracts with an insurance company to provide benefits for employees); *Hollister v. Molander*, 744 F. Supp. 846, 847 (N.D. Ill. 1990) (same).

The record also shows that West Bend "maintained" the plan.  First, West Bend paid employee premiums as to some aspects of the plan.  *See Postma*, 223 F.3d at 538 (finding ERISA coverage where "[m]any aspects of that plan were financed in whole or in part" by the employer); *Brundage-Peterson*, 877 F.2d at 511 (concluding that it is "especially clear" that a plan falls outside of the safe harbor where "the employer helps defray the employee's insurance cost"); *Russo*, 209 F. Supp. 2d at 859 ("Although not dispositive, an employer's payment of employees' premiums will almost invariably implicate ERISA.").  Second, there is evidence on the record that West Bend helped administer the plan by "Self-Billing/Admin" method, under which West Bend was responsible for tracking membership eligibility and changes.  Whether this billing method applied to the additional

life insurance benefits is weakly disputed, plaintiff conceded that the Self-Billing/Admin method was effective for at least the non-contributory components of the plan, a fact that also suggests ERISA coverage. *See Postma*, 223 F.3d at 538 (considering an employer's performance of administrative functions associated with the maintenance of a benefits plan as a factor in favor of ERISA coverage); *Cehovic-Dixneuf*, 895 F.3d at 930 (finding ERISA coverage over a voluntary, supplemental life insurance benefits plan where employer "maintained substantial administrative functions"). Third, West Bend consistently submitted Form 5500 filings with the IRS, which, as noted above, "is an annual report disclosing financial and actuarial information that is required to be filed with the Secretary of Labor under ERISA." *Bolssen*, 629 F. Supp. 2d at 882 (citing 29 U.S.C. §§ 1023, 1024). These filings -- again while not by themselves dispositive -- also factor in favor of a finding of ERISA coverage. *See Clevenger v. Securitas Sec. Servs. USA, Inc.*, No. 07-CV-2219, 2008 WL 2168742, at *7 (C.D. Ill. May 22, 2008) (an employer's Form 5500 filings is "one factor that courts may consider when determining ERISA coverage" although "it is not the only consideration nor the dispositive factor"). Fourth, the "allocation of authority" provision specifically provides that certain functions are reserved to West Bend (the policyholder), including the ability to set each member's premium contribution, the distribution of certificates to insured members, and the provision of certain records and reports to Standard. (*See* Blocher Decl., Ex. P (dkt. #11-16) 54, 58-60.) These expressly retained functions further suggest that West Bend played a significant role in administering the policy. *See Cehovic-Dixneuf*, 895 F.3d at 930 (that employer maintained administrative functions "beyond the very limited ones allowed in the safe harbor provision" factored in

favor of ERISA coverage).

"Only a minimal level of employer involvement is necessary to trigger ERISA." *Russo*, 209 F. Supp. 2d at 860. Here, despite the incomplete record, the undisputed facts establish that the plan and group policy at issue are governed by ERISA. Thus, plaintiff's state law claims of breach of contract and bad faith are preempted. *See Mondovi Dairy Sys., Inc. Employee Benefit Plan v. Blue Cross Blue Shield of Wisconsin*, No. 15-CV-826-JPS, 2016 WL 109965, at *4 (E.D. Wis. Jan. 8, 2016) ("The Court need not dwell long on the issue of preemption; indeed, both state claims in this case, breach of contract and bad faith, are unambiguously preempted by ERISA."); *Tomczyk v. Blue Cross & Blue Shield United of Wis.*, 951 F.2d 771, 777 (7th Cir. 1991) (per curiam) ("[S]tate law breach of contract . . . claims are preempted by ERISA."); *Smith v. Blue Cross & Blue Shield United of Wis.*, 959 F.2d 655, 657-58 (7th Cir. 1992) ("[T]he Smiths' [bad faith] claims are clearly preempted by ERISA."). Accordingly, the court will grant that part of defendant's summary judgment motion as to ERISA preemption of plaintiff's state law claims.

## II. Standard of Judicial Review

Provided that the court decided, as it now has, that ERISA governs the additional life insurance benefit at issue, both parties further ask the court to determine the appropriate level of judicial review to be applied. A denial of ERISA benefits "is to be reviewed under a *de novo* standard *unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (emphasis added). Under a *de novo* standard of review, this court would have "the

discretion to 'limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment.'" *Estate of Blanco v. Prudential Ins. Co. of Am.*, 606 F.3d 399, 402 (7th Cir. 2010) (quoting *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490 (7th Cir. 2007)); *see also Patton*, 480 F.3d at 490 n.7.

In contrast, when discretionary authority is effectively allocated, courts review the denial of benefits only to determine "whether the administrator's decision was 'arbitrary and capricious.'" *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009)). Under this deferential abuse of discretion standard, the court is limited to the evidence in the administrative record, *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001), although a plan administrator's self-interest in the outcome of a benefit denial decision, while not formally affecting the standard of review, may be a "'factor' to 'weigh' in evaluating the decision." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981 (7th Cir. 1999) (citing *Firestone*, 489 U.S. at 115).

Where, as here, there is both an employer/policyholder and insurer, there is an additional question as to whether the delegation of discretionary authority to the plan administrator implies a grant of discretion to the administrator's fiduciaries or third parties. *See Skibbe v. Metro. Life Ins. Co.*, No. 05 C 3658, 2007 WL 2874035, at *10 (N.D. Ill. Sept. 24, 2007). While the Seventh Circuit has "declined to reach the question of whether the delegation of a plan administrator's discretionary authority need be express," *Id.* (citing

*Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 810-11 (7th Cir. 2006)), other courts have required explicit direction granting-language. *See, e.g.*, *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1388-89 (9th Cir. 1994); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001); *McKeehan v. CIGNA Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003). Unsurprisingly, plaintiff argues that such delegation must be express and that, therefore, to invoke deferential judicial review, defendant must point to "clear and unequivocal" language expressly delegating authority specifically to Standard, and not just to West Bend. (Pl.'s Br. (dkt. #9) 17.)

More broadly, plaintiff argues that the *de novo* standard of review is appropriate here. At the outset, she contends that because Standard has not produced a contemporaneous policy document, it cannot show that it effectively delegated discretionary authority as required to be entitled to a deferential standard of review. (*Id.*) As discussed above, however, the court has now concluded that the GLIP document produced by Standard reflects the underlying life insurance policy in effect during the relevant time.

Still, there remains a dispute over the existence and content of a contemporaneous SPD. This factual dispute is significant, as courts examine both the underlying insurance policy and SPD to determine the appropriate level of judicial review that applies in an ERISA action. *See, e.g.*, *Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1022 (7th Cir. 1998); *Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of Am. Gen. Corp.*, 413 F.3d 652, 660 (7th Cir. 2005). Indeed the Seventh Circuit has expressly rejected an insurer's arguments that only the underlying policy document may be considered in determining the appropriate level of deference. *See* Raybourne *v.*

*Cigna Life Ins. Co. of New York*, 576 F.3d 444, 448 (7th Cir. 2009) ("Elsewhere we have rejected Raybourne's assumption that only the original plan (here, the underlying insurance policy) may be considered in determining whether a plan administrator is entitled to deference.").  Given the ongoing factual dispute regarding the controlling plan document, a decision on the level of deference owed to Standard's decision would be premature. Accordingly, on the record before it, this court must deny both plaintiff's motion for declaratory judgment and defendant's motion for summary judgment as to this issue.

## III. Plaintiff's Motion to Amend

The final issue before the court is plaintiff's motion to amend her complaint.  Plaintiff seeks to add three additional claims:  (1) for "equitable relief"; (2) for wrongful denial of benefits contrary to the terms of the insurance plan under ERISA, 29 U.S.C. § 1132(a)(1)(B); and (3) for "equitable relief under ERISA," including reformation, estoppel, and "relief in any form that the Court deems just and appropriate under the circumstances."  (Blocher Decl., Ex. Q (dkt. #11-17) 4-7.)  Rule 15(a) provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Supreme Court has further cautioned that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given."

*Id.*

Defendant argues only that plaintiff should not be permitted to amend her complaint because the proposed claims would be futile. As an initial matter, to the extent that plaintiff's claim for "equitable relief" is based on state law, the court agrees with defendant that such an amendment would be futile. As discussed above, ERISA broadly preempts related state law claims. *See Di Joseph v. Standard Ins. Co.*, 776 F. App'x 343, 347 (7th Cir. 2019) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("ERISA's preemption provision encompasses 'any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy.'"). Moreover, because ERISA itself provides for equitable relief, plaintiff's state law claims would only duplicate ERISA's causes of actions.

While defendant also argues that plaintiff's proposed ERISA claims would be futile, the court is unable to rule on the merits of plaintiff's proposed ERISA actions given the ongoing, material dispute over the existence and/or content of the effective SPD. *See Mers*, 144 F.3d at 1022 (holding that an SPD may in some circumstances prevail if its terms conflict with those of the underlying insurance policy document). Accordingly, reliance on only the GLIP document to determine Ms. Burclaw's ERISA rights would be improper.

Defendant also advances additional arguments regarding the futility of plaintiff's equitable ERISA claims. *First*, with regard to plaintiff's ERISA estoppel claim, defendant argues that this claim would be futile because she is unable to prove detrimental reliance. (Def.'s Opp'n (dkt. #20) 23.) Specifically, defendant points out that the letter stating the $250,000 amount was received by the Burclaws only after Mr. Burclaw had gone on disability, and according to the policy document, only members who are "Actively at

Work" are able to increase their life insurance election. Therefore, according to defendant, plaintiffs cannot argue that the Burclaws would have increased his life insurance election if they had been accurately informed that coverage was for $150,000. However, detrimental reliance is not a requirement of an ERISA estoppel claim, and even in the absence of detrimental reliance, a defendant may be estopped from denying benefits based on the terms of a plan where there exists a conflict between the policy and the plan description. *See Hopkins v. Prudential Ins. Co. of Am.*, 432 F. Supp. 2d 745, 762 (N.D. Ill. 2006) ("A claimant, however, need not show detrimental reliance before a court can estop a denial of benefits based on the SPD's failure to satisfy § 1022.") (citing *Bowerman v. Wal–Mart Stores, Inc.*, 226 F.3d 574, 587 (7th Cir. 2000)).

*Second*, defendant argues that plaintiff's reformation argument is futile because such a claim involves modification of a "plan document" to comport with her reasonable expectation of benefits, and plaintiff has only Standard's 2015 letter to argue for an additional plan benefit, which is not a "plan document." (Def.'s Reply (dkt. #30) 18.) However, plaintiff *is* seeking to modify the plan document -- namely, the amount of benefits to be awarded under the current circumstances -- to comport with Standard's documentation, as reflected in the 2015 letter, of an additional life insurance policy in the amount of $250,000. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 896 (N.D. Ill. 2009), *aff'd*, 615 F.3d 808 (7th Cir. 2010) ("Courts have also acknowledged the viability of an ERISA reformation claim where communications to participants clearly summarized intended plan terms that were not reflected in the formal plan due to a drafting error."). Therefore, on the current record, reformation is not

obviously futile.

On the contrary, even if an arbitrary and capricious standard of review applies, plaintiff has come forward with sufficient evidence to question defendant's determination, especially after weighing Standard's obvious self-interest in denying plaintiff's claim for an additional benefit. For example, in 2013, when Mr. Burclaw began at West Bend, voluntary benefits elections were made through a computer portal called "Benefits Solver." Standard produced various print-outs from the Benefits Solver system regarding Mr. Burclaw's additional life coverage. While defendant maintains that these print-outs show that Mr. Burclaw initially selected the $250,000 additional life insurance option on February 21, 2013, but then reduced the election to $150,000 the following day, plaintiff disputes Standard's interpretation of the print-outs, arguing that they are at best "incomplete and inaccurate." (Def.'s Reply to Pl.'s Response to Def.'s PFOF (dkt. #29) ¶ 45.) Further, plaintiff points to what it calls a "complete" print-out from Benefits Solver from October 12, 2015, which it argues shows that Mr. Burclaw's "current" voluntary life insurance election was $250,000. (Def.'s Response to Pl.'s PFOF (dkt. #28) ¶ 16.)

Moreover, the underlying documents do not on their face fully support either parties' claims. The documents cited by defendant are copied in relevant part below:

## Voluntary Life Election - Coverage Terminated
This member dropped the Additional Life with ADD - 150,000 plan.

02/21/2013;09;43;05 - West Bend Mutual Insurance New Hire Enrollment transaction by David Burclaw    (5 of 5)

Voluntary Life Election - Additional Life with ADD

Coverage: $250,000

| Member(s) | Covered | Effective Date | Term Date |
|---|---|---|---|
| David Burclaw | Yes | 03/20/2013 | |

(Jones Decl., Ex. A (dkt. #22-1) 78.)



(*Id.* at 77.)

Certainly, these documents do suggest that Mr. Burclaw had $250,000 in coverage on February 21, 2013, and $150,000 in coverage on February 22, 2013. (*Id.* at 77-78.) However, both documents also state "Coverage Terminated" and "This member dropped the Additional Life with ADD - 150,000 plan," which *neither* party is contending occurred here. And, as plaintiff argues, nothing in the documents specifically support defendant's contention that it was *Mr. Burclaw*, as opposed to an employee at Standard or West Bend, who made the claimed change to his election. (*Id.*)

The Benefits Solver document referenced by plaintiff is similarly inconclusive:

Voluntary Life Election - Additional Life with ADD

02/21/2013:09:43:05 - West Bend Mutual Insurance New Hire Enrollment transaction by David Burclaw          (2 of 2)

Voluntary Life Election - Additional Life with ADD
Coverage: $250,000

| Member(s) | Covered | Effective Date | Term Date |
|---|---|---|---|
| David Burclaw | Yes | 03/20/2013 | |

(*Id.* at 144-45.) Although this document does indicate a coverage level of $250,000, the

date listed for this entry is February 21, 2013, which according to defendant was one day before Mr. Burclaw changed his election. (*Id.*) Moreover, while plaintiff suggests that this document was "from" October 12, 2015, that date is located in a footer and simply appears to be the date that the document was printed. (*Id.*)[8] Plaintiff additionally argues that this print-out should be relied upon over defendants' documents as her version is more "complete," but the document itself does not support such a contention; plaintiff's cited document simply appears to be a different view of similar information. (*Compare id.* at 76-77 *with id.* at 144-45.)

Defendant more persuasively cites to copies of Mr. Burclaw's payroll records from West Bend to support its contention that he was enrolled during the relevant period for the $150,000 additional life insurance benefit. It is also undisputed that Mr. Burclaw's paystubs from September 6, 2014, through October 17, 2015, show that $14.19 was deducted from his bi-weekly payroll checks for "VLI," which "align with the $150K for VLI." (*Id.* at 80.)

For her part, plaintiff does not appear to dispute that the premium paid by Mr. Burclaw aligned with the $150,000 election; instead, she contends that Mr. Burclaw was charged the lower premium amount due to *West Bend*'s misunderstanding of his coverage election. (Pl.'s Opp'n (dkt. #23) 20.) To support this interpretation, plaintiff points to a print-out of a "claim events" page that includes a comment recorded on October 17, 2015, which states: "Examiner & I looked at the AL Enrollment and agree that AL should be

---

[8] Regardless, this contention does not advance plaintiff's claim as a similar footer for the Benefits Solver documents cited by defendant shows an even later date -- June 12, 2017. (*Id.* at 76-77.)

250k. (The ER Statement indicates 150kk)." (Jones Decl., Ex. A (dkt. #22-1) 178.) According to plaintiff, this shows Standard determined in 2015 that West Bend's understanding of Mr. Burclaw's coverage amount was an error and that the "correct" amount was $250,000. (Pl.'s Opp'n (dkt. #23) 20.) Plaintiff additionally points to numerous other documents from Standard indicating that it understood Mr. Burclaw's additional life insurance coverage amount to be $250,000. (*See* Jones Decl., Ex. A (dkt. #22-1) 132, 138, 145, 147, 148, 150, 155, 162, 171, 175, 176, 178, 180, 181, 194, 208, 211.)

On this record, therefore, it is undisputed that Mr. Burclaw paid a premium that aligned with additional coverage in the amount of $150,000, rather than $250,000, but that Standard understood Mr. Burclaw to be enrolled in the $250,000 plan, leaving a genuine dispute of fact as to the source of this discrepancy and as to whether the $150,000 or the $250,000 coverage amount reflected the election in force during the relevant time. Whether or not this evidence is enough for plaintiff to prevail, it is certainly more than enough to grant plaintiff's proposed amendments over defendant's objection that doing so would be "futile".

Finally, although defendant only expressly objected to plaintiff's proposed amendments on futility grounds, the court is also mindful of any prejudice that might accrue to defendant in permitting plaintiff to amend her complaint at this late date in the litigation. This is true especially in light of plaintiff's hints that she has not yet conducted *any* discovery, but may yet seek to do so. (*See* Pl.'s Opp'n (dkt. #23) 3 n.1.) Plaintiff, however, had ample opportunity to seek discovery in accordance with the court's

preliminary pretrial conference order (dkt. #6), in which the court specifically cautioned that "[a]ll discovery in this case must be completed not later than [October 1, 2019], absent written agreement of all parties to some other date." Plaintiff suggests that no discovery occurred because Standard took the position that "that ERISA applies, and Ms. Burclaw is not entitled to conduct any discovery." (Pl.'s Opp'n (dkt. #23) 3 n.1.) And the court recognizes and is sympathetic to the fact that the parties' joint discovery plan indicates that they had hoped to receive an early determination from this court regarding the applicability of ERISA prior to the commencement of discovery. (Dkt. #5.) However, when it became apparent that an early determination was not forthcoming, plaintiff could have challenged Standard's position blocking discovery -- through a motion to compel, if necessary -- rather than simply waiting until long after the close of discovery to voice her concerns. Even though plaintiff's original state law claims have now been supplanted with ERISA claims, if plaintiff had initiated discovery on her original claims she would be in a much better position now to proceed on her ERISA claims given the overlapping issues.

Regardless, these concerns are not immediately implicated by plaintiff's request to amend her complaint, which does not at present include a formal request to reopen discovery. Moreover, the amendment does nothing more than to convert similar state law claims that defendant has been on notice of since the beginning of this case. Therefore, no "undue prejudice" should accrue to defendant, *Foman*, 371 U.S. at 182, plaintiff will be given leave to amend her complaint to add the ERISA claims proposed in her amended complaint. (*See* Blocher Decl., Ex. Q (dkt. #11-17) 4-7.)

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for declaratory relief (dkt. #7), which the court construes to be a motion for partial summary judgment, is DENIED;

2) Plaintiff's motion to amend her complaint (dkt. #7) is GRANTED IN PART and DENIED IN PART in accordance with the opinion above;

3) Defendant's motion for summary judgment (dkt. #12) is GRANTED IN PART and DENIED IN PART in accordance with the opinion above.

Entered this 24th day of January, 2020.

BY THE COURT:


_____
WILLIAM M. CONLEY
District Judge